IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Helwig A. Stewart, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:15-4208 |
| v. | ) | |
| | ) | |
| American Credit Acceptance, LLC, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court upon Plaintiff Helwig A. Stewart's ("Plaintiff" or "Stewart") complaint alleging a claim of racial discrimination in violation of 42 U.S.C. § 1981 and a state law claim for libel or slander per se. On November 7, 2016, Defendant American Credit Acceptance, LLC ("Defendant" or "ACA") filed a motion for summary judgment. Plaintiff filed a response in opposition to Defendant's motion, and Defendant filed a reply.

The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(g), D.S.C. On July 25, 2017, Magistrate Judge Kevin F. McDonald issued a report and recommendation ("Report"), outlining the issues and recommending that the Court grant Defendant's motion for summary judgment. After being granted an extension of time, Plaintiff filed objections to the Report, and after being granted an extension of time, Defendant filed a reply to Plaintiff's objections.

## STANDARDS OF REVIEW

### I.    The Magistrate Judge's Report

The Magistrate Judge makes only a recommendation to this Court. The

recommendation has no presumptive weight. The responsibility for making a final determination remains with this Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The Court is charged with making a *de novo* determination of any portions of the Report and Recommendation to which a specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b)(1). The Court need not conduct a *de novo* review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a timely filed, specific objection, the Magistrate Judge's conclusions are reviewed only for clear error. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

## II.    Summary Judgment

A court shall grant summary judgment if a party shows that there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

In his written objections, Plaintiff first objects to the Magistrate Judge's recitation of the facts and asserts that the Magistrate Judge failed to consider the facts in the light most favorable to him. Next, Plaintiff objects to the Magistrate Judge's legal conclusions. The Court will consider both Plaintiff's factual objections and his legal objections below.

## I. Plaintiff's Factual Objections

In the Report, the Magistrate Judge included a detailed, 15-page explanation of the facts presented. As the Magistrate Judge noted, Defendant hired Plaintiff, who is a black male of Jamaican origin, on April 1, 2013, to work as Portfolio Reporting Manager for Spartan Financial, a division of ACA. About two months later, Plaintiff's supervisor, Mark VanGeison, informed Plaintiff that there was a problem at ACA in the Collections Department, and that Plaintiff's name had come up as someone who could help. The next day, Curt Sidden, Chief Executive Officer ("CEO") of ACA, met with Plaintiff and told him, "I want you to go over there and improve communication, fix the processes, and look at ways you can improve what they are doing." (ECF No. 59-2 at 40.)

Chris Shelley, ACA's Director of Servicing at the time, had been interviewing candidates for a new position, Collections Manager. Mr. VanGeison, Mr. Sidden, and Tom Holgate, Chief Operating Officer of ACA, asked Mr. Shelley to interview Plaintiff for the position. Mr. Shelley interviewed Plaintiff, and Mr. Shelley testified that he believed Plaintiff's position was being eliminated but that ACA wanted to retain Plaintiff as an employee because it believed he had good vision and values. According to Mr. Shelley, Plaintiff was "good with people, good with processes, good with the core business." (ECF No. 56-3 at 49.)

ACA sent Plaintiff an offer letter for the Collections Manager position on June 20, 2014, and Plaintiff accepted the position. Plaintiff asserts that he informed Mr. Shelley that he was concerned about working in an area where he did not understand the process. Plaintiff began employment as Collections Manager on July 14, 2014. The position reported directly to Mr. Shelley but was only three levels of management below the CEO. Plaintiff was responsible for managing multiple departments, supervisors, team leaders, and approximately 30 to 40 employees.

On Plaintiff's first day, Mr. Shelley met with Plaintiff to discuss his expectations for Plaintiff's performance. According to Mr. Shelley, he expected Plaintiff to "run it like you own it" and to manage the department with little supervision. (*Id.* at 54-55.) Plaintiff, however, hoped to have more interaction with and direction from Mr. Shelley. According to Plaintiff, he and Mr. Shelley interacted at least one time per day, but the interactions were primarily meetings and were not about the actual job. According to Mr. Shelley, he and Plaintiff regularly interacted.

Mr. Shelley was dissatisfied with Plaintiff's performance as Collections Manager in the first ninety days and documented performance issues on August 15; September 2, 18, and 22; and October 9, 2014. Mr. Shelley, at Plaintiff's request, met with Plaintiff on October 10, 2014, to review his performance and Mr. Shelley's expectations. On October 15, 2014, Mr. Shelley noted another performance issue, and he sent a summary of the issues to Sharon Ponder, ACA's Human Resources Business Partner. Mr. Shelley informed Ms. Ponder that he believed Plaintiff had been moved into a role that was more difficult than his previous position and recommended that "given his lack of performance in Spartan where he was set to be laid off, . . . we continue with the initial layoff and

4

severance package." (ECF No. 56-3 at 50.) Mr. Shelley also discussed his recommendation with Mr. Holgate, and Mr. Holgate elevated these concerns to the CEO, Mr. Sidden. Mr. Sidden reviewed the request and told Mr. Shelley to spend more time coaching and developing Plaintiff and to give him more time to succeed.

In paragraphs one through three of his objections, Plaintiff asserts that his testimony contradicts the narrative both that Plaintiff was to be laid off at the time of his transfer to Collections Manager and that Chris Shelley had anything to do with his hiring. Plaintiff also asserts that the Magistrate Judge's factual recitation "unfairly gives the impression that Mr. Shelley did not take issue with Plaintiff from the beginning, which is drawing a directly contested inference in favor of Defendant." (ECF No. 70 at 2.) Plaintiff asserts that Mr. Shelley did not ease him into the job or allow him to build his skills, and Plaintiff asserts that he testified extensively about the lack of interaction with and support from Mr. Shelley. Likewise, Plaintiff asserts that the paragraph about Mr. Shelley's characterization of Plaintiff's performance issues "skews the evidence in Defendant's favor and totally ignores all parts of the record that are favorable to Plaintiff." (*Id.*)

Although Plaintiff challenges the Magistrate Judge's depiction of the facts, nowhere does he cite to his own testimony or other evidence to contradict the Report. In addition, although Plaintiff contends that Mr. Shelley took issue with him from the beginning and that Mr. Shelley did not ease him into the job, this fact is actually apparent from the Magistrate Judge's Report. As previously mentioned, the Magistrate Judge noted that Plaintiff hoped to have more interaction with Mr. Shelley, and that Mr. Shelley took issue with Plaintiff's performance within the first ninety days of his employment as Collections Manager. Likewise, Plaintiff asserts that Mr. Shelley's attempt to have Plaintiff fired was rejected

because ACA's CEO determined that Plaintiff needed more time to develop. The Magistrate Judge specifically noted that Mr. Sidden reviewed Mr. Shelley's complaints about Plaintiff (and Mr. Shelley's desire to have Plaintiff laid off) and told Mr. Shelley to spend more time coaching and developing Plaintiff and to give him more time to succeed. Finally, to the extent Plaintiff disputes the testimony of those involved in hiring Plaintiff, the Court agrees with Defendant that because Plaintiff was not involved in those discussions, he cannot rely on his own testimony to dispute that evidence. Overall, the Court finds no merit to Plaintiff's objections in paragraphs one through three.

The Magistrate Judge's recitation of the facts continues as follows: Plaintiff testified that when he was out of sick leave, Mr. Shelley made arrangements for him to move to the Titles Department without consulting him, and that when he returned from sick leave, the Manager of the Titles Department came to him and told him that there were problems in that department and that he wanted Plaintiff to fix them. Plaintiff went to Mr. Sidden, who told him to stay in his current position and that "no one is going to make you change until I say that." (ECF No. 59-2 at 71.) Ms. Ponder testified that Mr. Shelley and Mr. Holgate were "considering" moving Plaintiff to the Titles Department at some point and that Mr. Shelley mentioned it "in passing." (ECF No. 60-2 at 26.)

The record indicates that Plaintiff had established a good relationship with Mr. Sidden, who is white, and Plaintiff testified that there was nothing that would make him think that Mr. Sidden would let race be a factor in his decisions. (ECF No. 56-2 at 36-37.)

On December 18, 2014, Plaintiff won the Goldman Award, which recognizes "an associate who exemplifies: a strong sense of community, determination towards excellence and teamwork, a foundation of respect and integrity, [and] commitment to customer

service." (ECF No. 60-7.) According to Mr. Shelley, the award recognizes "the top one or two people within the company each year for their outstanding community service, great attitude and things of that nature." (ECF No. 59-4 at 108.)

On January 19, 2015, Mr. Shelley issued Plaintiff's first annual performance evaluation, which included Plaintiff's work in the Spartan Division as well as his work as Collections Manager. According to Mr. Shelley, he spoke with Mr. VanGeison, Plaintiff's supervisor at Spartan, who stated that Plaintiff "was great organizationally and had good management skills," but that he "struggled in the group from a technical perspective." (ECF No. 56-3 at 35-36.) Mr. Shelley noted that Plaintiff had moved from Spartan into his current position mid-year, and that it was a position in which Plaintiff "had no previous experience, resulting in a progressive learning environment managing supervisors rather than individual contributors." (ECF No. 56-3, Ex. 1.) Mr. Shelley rated Plaintiff as "partially meets expectations" in certain performance factors in the areas of "job knowledge & development" and "productivity & quality." (*Id.*) In the areas of "communication & teamwork," "customer service (external and internal)," and "leadership & associate engagement," Mr. Shelley gave Plaintiff the highest possible rating of "greatly exceeds expectations." (*Id.*) Mr. Shelley highlighted the fact that Plaintiff had an outgoing and friendly personality and an ability to motivate his employees, which Mr. Shelley stated helped offset the fact that this was one of his own weaknesses. (*Id.* at 39.) In an area entitled "communication & teamwork - builds and maintains effective working relationships," Mr. Shelley commented, "Performance is good in this area, ensure employee confidentiality is maintained to maintain trust with associates at all levels." (*Id.* Ex. 1.) Mr. Shelley testified that this comment was in reference to an incident where he counseled Plaintiff about not sharing

confidential information regarding his subordinate employees.  (*Id.* at 31-35.)  Specifically, Mr. Shelley testified that Plaintiff had a disagreement with a subordinate, Ashley Rhone, and that Ms. Rhone became upset with Plaintiff.  Ms. Rhone's co-workers overheard her yelling and Plaintiff told Ms. Rhone's co-workers why she was upset.  (ECF No 56-2.) Plaintiff explained what had happened to Mr. Shelley, who brought Plaintiff and Ms. Rhone into his office to talk about it.  Ms. Rhone complained to Mr. Shelley that Plaintiff had been making negative comments about her performance and her work ethic to her co-workers. (ECF No. 56-3.)  According to Mr. Shelley, after Ms. Rhone left the meeting, Mr. Shelley counseled Plaintiff on the importance of not discussing confidential employee issues with his subordinate, non-management employees.  (*Id.* at 33-35.)

In paragraph four of his objections, Plaintiff takes issue with the Magistrate Judge's depiction of the Ashley Rhone incident, and he asserts that he was not formally counseled or disciplined regarding the incident.  (ECF No. 70 at 3.)  Plaintiff asserts that the Rhone incident was "an after-the-fact attempt to justify jumping over several steps in the progressive discipline policy."  (*Id.*)

Here, although the Magistrate Judge referred to Mr. Shelley's testimony where Mr. Shelley indicated he "counseled" Plaintiff on the importance of not discussing confidential employee information, the Magistrate Judge did not find that Plaintiff was formally counseled or disciplined.  In addition, the Magistrate Judge also cited Plaintiff's deposition when discussing the Ashley Rhone incident and discussed both the negative *and* the positive portions of Plaintiff's first performance evaluation.  Ultimately, the Court does not agree with Plaintiff that the Magistrate Judge somehow skewed the evidence unfairly.

The Magistrate Judge's outline of the facts continues as follows: According to

Plaintiff's testimony, during his evaluation Mr. Shelley told him, "I cannot understand you. I cannot understand the way you talk." (ECF No. 59-2 at 57.) When Plaintiff asked why Mr. Shelley could not understand him, Mr. Shelley responded, "Because you have a third world accent." (*Id.*) Plaintiff further testified that, on another occasion, they were discussing Barbados because Mr. Shelley was trying to go there, and Mr. Shelley stated, "I don't think I'll survive there around those coons." (*Id.* at 59.) Plaintiff testified that another time Mr. Shelley stated that an African-American female employee's tattoos looked like "jailhouse tattoos." (*Id.* at 59.) According to Plaintiff, Mr. Shelley once asked him why he was hiring so many black people. (*Id.* at 62.) Plaintiff responded that he was hiring the best people he could, and Plaintiff stated that Mr. Shelley had the final say in who was hired. Plaintiff testified that on another occasion a man with albinism interviewed for a position, and Mr. Shelley stated, "I'm interviewing for someone to be our bitch. . . . [B]ut I wouldn't hire that guy. I mean, look at him. He is an albino." (*Id.* at 189.)

On March 24, 2015, Ms. Rhone informed Ms. Ponder that Plaintiff told her about a situation where three of Ms. Rhone's co-workers had come to Plaintiff because they heard from someone outside the workplace that they were going to be fired. Ms. Rhone stated that Plaintiff told her that one of those co-workers, Vanessa Scott, was manipulative. Ms. Rhone felt that Plaintiff behaved inappropriately by discussing with her the conversation he had with her three co-workers. Ms. Ponder spoke with two of the three co-workers, Ms. Scott and Lea Burnett, and documented her investigation. According to Ms. Ponder, Plaintiff's conduct was inappropriate because employee concerns communicated to management were supposed to be kept confidential. (ECF No. 56-4 at 33-34.) Because Plaintiff had previously been counseled on employee confidentiality, Ms. Ponder decided

to elevate this incident to a final written warning.  (*Id.* at 38-39.)

Ms. Ponder testified that she handled the investigation because Ms. Rhone and Ms. Scott had come to her, and after she decided what action was needed, she talked to Mr. Shelley, who agreed with the recommendation of a final warning and signed it.  (*Id.*)  Ms. Ponder further testified that she told Mr. Shelley she would like for him to present the warning to Plaintiff as his supervisor and she would sit in on the presentation.  (*Id.*)  On March 26, 2015, the final written warning was presented to Plaintiff, and Ms. Ponder testified that, during the presentation of the final warning, Plaintiff admitted telling Ms. Rhone about the meeting he had with her three co-workers, but he denied calling Ms. Scott manipulative.  (*Id.* at 34, 52.)  The final written warning states in pertinent part, under "reason for warning" that "Employee confidentiality was addressed in your performance appraisal on 1/19/2015."  (*Id.* Ex. 2.)

The final written warning also references that Plaintiff "was coached in December 2014 regarding risk in giving your associates rides home which could result in the perception of favoritism as well as additional liability."  (*Id.*)  Plaintiff testified that an associate, Fannita Harris, did not have a car and that she found out that Plaintiff drove by her house on his way home.  (ECF No. 59-2 at 74-75.)  Plaintiff had requested that employees work overtime, and Ms. Harris went to Plaintiff and asked if he would give her a ride home so she could work overtime.  (*Id.*)  Plaintiff did not think there was anything wrong with it, and he gave her a ride home a couple of nights.  (*Id.*)  On one occasion, Ms. Harris was crying and told Plaintiff she did not have any money for food and her child was hungry.  Plaintiff paid for some food for her because he felt sorry for her.  When Plaintiff mentioned the situation to a friend who worked in Human Resources, the friend told Plaintiff

he should not give Ms. Harris rides. Plaintiff then told Ms. Harris that he could no longer give her rides. (*Id.*)

In April of 2015, Vanessa Scott resigned. Ms. Scott completed the company's exit interview form, and Ms. Ponder conducted an exit interview with her. In the interview, Ms. Scott alleged that Plaintiff acted unprofessionally as a manager and that he flirted with female employees and said vulgar things. She said that Plaintiff told her that he and his wife slept in separate beds and that he "danced with an old friend" and "his penis got hard." She also said that Plaintiff made an inappropriate comment to her and Lea Burnett about a woman's backside and tight pants during a fire drill. (ECF No. 56-4 at 52, Ex. 4; ECF No. 56-6 at 156-59, Ex. 7.)

Based on Ms. Scott's allegations, Ms. Ponder interviewed Ms. Burnett who confirmed that she heard Plaintiff whisper to Ms. Scott during a fire drill, "boy look at her butt in those pants," and that she observed Plaintiff staring at a woman's "backside" on another occasion. (ECF No. 56-2, Ex. 6; ECF No. 56-4 at 65, 74, Ex. 5.) According to Ms. Scott, Plaintiff regularly made these types of comments. (ECF No. 56-6 at 157-58.) Plaintiff does not dispute that Ms. Scott and Ms. Burnett provided this information to Defendant; however, he does dispute whether the information is true. (ECF No. 56-2 at 99-100.)

Mr. Shelley was not involved in Ms. Scott's exit interview, the subsequent investigation, or any decisions on how to respond. (ECF No. 56-3 at 82-83, 92; ECF No. 56-4 at 72-73.) Ms. Ponder testified that Vice President of Human Resources, Andrea Forino, told her to pull emails between Ms. Scott and Plaintiff to find out if they could confirm any of Ms. Scott's allegations, but nothing was found in the emails. (ECF No. 60-2

at 69-70). Todd Trawick, Mr. Shelley's supervisor and current COO of ACA, and Ms. Forino reviewed the allegations of Ms. Scott and Ms. Burnett and then met with Plaintiff. (ECF No. 56-4 at 71-73; ECF No. 56-3 at 92; ECF No. 56-7 ¶ 3.) Plaintiff denied making the alleged comments. (ECF No. 56-2 at 96-97.) Ms. Forino informed Plaintiff that this was his last chance and that any other confirmed misconduct would result in his termination. (*Id.*; ECF No. 56-7 ¶ 3.) Plaintiff did not receive a written warning or any other documented discipline related to the reports of Ms. Scott and Ms. Burnett, and according to Mr. Trawick, he and Ms. Forino "decided to give [Plaintiff] the benefit of the doubt and not issue any discipline," but they informed Plaintiff "that he was being given one last chance and that any other confirmed behavior issues would result in termination of his employment." (ECF No. 56-7 ¶ 3.) Plaintiff understood that he "would have to be a tightrope walker" and that if he did anything inappropriate it could cost him his job. (ECF No. 56-2 at 97-100.) Plaintiff told one of his subordinate employees that he was on his "last strike." (ECF No. 56-8 at 70.)

In her exit interview and form, Ms. Scott also alleged that she "heard racist talk" from her former supervisor, Angela Preuter, who is a white female. Specifically, she alleged that she overheard Ms. Preuter talk about a "black girl who got drunk and knocked on a guy's door" and was shot through the door, saying the girl got what she deserved. She also claimed that Ms. Preuter stated that the "character of Satan looked like Obama, and she always had something to say about Obama's law & his appearance." (ECF No. 56-4 at 34, Ex. 4.) Ms. Ponder testified that she talked with Mr. Shelley and that he had a conversation with Ms. Preuter regarding making comments on the floor that were inappropriate. (ECF No. 60-2 at 61-62.) Ms. Ponder did not investigate the other complaints regarding Ms. Preuter. (*Id.*)

In paragraphs five and six of his objections, Plaintiff contends that the Magistrate Judge unfairly described the incident for which Plaintiff received a final warning. (ECF No. 70 at 3.) Plaintiff contends that the evidence developed during discovery was not clear about why Plaintiff received a final warning. Importantly, however, Plaintiff points to no contradictory evidence. In any event, Plaintiff contends that the Magistrate Judge accepted Ms. Ponder's version of the events and portrayed her testimony in the light most favorable to Defendant. While the Court does not agree with Plaintiff's assessment because it appears that the Magistrate Judge simply outlined Ms. Ponder's testimony, the fact remains that Plaintiff has not alleged that Ms. Ponder had any discriminatory animus. Thus, the fact that he disagrees with her version of the events is not relevant.

Moreover, the Court does not agree with Plaintiff that the Magistrate Judge afforded too much weight to the comments Ms. Scott made about Plaintiff during her exit interview. Rather, the Magistrate Judge simply outlined the specific complaints Ms. Scott made about Plaintiff and indicated that Plaintiff denied engaging in the conduct complained of by Ms. Scott. The Court finds Plaintiff's objections in paragraphs five and six without merit.

The Magistrate Judge's outline of the facts continues as follows: On April 24, 2015, Brenda Massaquoi, who is African-American and one of Plaintiff's subordinates, went to Ms. Ponder and complained that her supervisor, Ms. Preuter, had denied her request for time off. (ECF No. 60-2 at 87-94.) Ms. Massaquoi stated that Ms. Preuter was a racist. (*Id.* at 91.) During the meeting, Ms. Massaquoi also reported to Ms. Ponder that there were rumors that Plaintiff was "sleeping with" one of his female subordinates. She reported that Plaintiff talked to this subordinate all the time; that he was in this subordinate's office all the time; that he went to lunch with her and took her to pick up her car; and that there was a

rumor that he paid her rent. She reported that he also may have an inappropriate relationship with another female subordinate. (ECF No. 56-2, Ex. 7.) Ms. Ponder sent Ms. Forino an email regarding Ms. Massaquoi's statements. (*Id.*)

Based on the report from Ms. Ponder, Ms. Forino approved the review of Plaintiff's work email account. (ECF No. 56-9 ¶ 6.) Ms. Ponder conducted this review and did not inform Mr. Shelley prior to the review. Ms. Ponder's review of Plaintiff's emails revealed the following communications between Plaintiff and two subordinate female employees:

### *E-mails with Lakendra Wallace*

**1. 1/22/15 - No Subject**
Plaintiff - So you going on a cruise with me?
Wallace- Yes
Plaintiff - Stop playing . . . I am serious
Wallace - *lol
Plaintiff - What does that mean? You scared of Shawn? [referring to Ms. Wallace's boyfriend]
Wallace - I told you yes. No I'm not scared.

**2. 1/28/15 - Subject "2/2"**
Plaintiff- It's your birthday? What do you want from me?
Wallace-Thank you. Yes it is. I want a million dollars! Lol . . .
Seriously, I don't ask for much, Helwig. A card, balloon or lunch will be fine.
Plaintiff- Ok . . . you can have whatever you want . . . minus the $1MM

**3. 2/2/15 - Subject "Happy Birthday and Doughnuts"**
Plaintiff - What did you get for your birthday? When do you want my PRESENT?
Wallace - I had a mini vacay this weekend at Embassy Suites in NC, money and necklace. You didn't get me anything.

**4. 3/23/15- Subject "hey"**
Plaintiff - I thought about you this weekend. Something you said.
Wallace - I hope you feel better. My weekend could've been longer.
Plaintiff - Mine too. But it is a good thing . . . I get to see you.

**5. 4/13/15- Subject "Not me"**
Plaintiff - Why were you upset? I was upset this weekend, waiting for you to

call

Wallace - *lol, That is so funny!  I was a little upset too.

Plaintiff - You send the email to someone else.  Not me.  Hmmm . . . I wonder?!!!!

(ECF No. 56-2, Ex. 9.)

### E-mails with Katisha Gill

**1. 11/18/14 - Subject "expression"**

Gill - Are you okay?

Plaintiff - What time are you leaving?  I am so mad ...... .

Gill - At 7PM I see your frustration on your face .

Plaintiff - Sorry to show my frustrations like that but these folks are pissing me off.  Too much Chiefs and not enough Indians.

Gill - I've been saying that since I have been on this team.  Now I see that this is across the board.


**2. 12/5/14- Subject "What are you doing for lunch?"**

Plaintiff sent with subject only.

Gill - I apologize for my tardiness of responding.  I'm going to get baby..

Plaintiff - Ok . . . no lunch for you . . . (speaking in the Soup Nazi guys voice)

Gill- That's not nice, but it could be nice if you go get and then we eat in the back like the other day.


**3. 12/9/14 - Subject "LUNCH"**

Gill - What you doing for lunch?

Plaintiff - Nothing . . . what do you want to do?

Gill - I don't know.  I was thinking Mexican.  Do u have coupon?

Plaintiff- Yes I do . . . Monterey's.  Have to pick up your daughter today?

Gill - No that's why I asked about lunch?

Plaintiff- Ok missy . . . . . when do you want to go?

Gill - We need a 3rd person for nothing will be said you think?


**4. 12/29/14 - Subject "Ashley Rhone's behavior."**

The plaintiff forwarded Ms. Gill e-mails from Human Resources about the discipline and issuance of a written warning to his subordinate Ashley Rhone. He then referred to Ms. Rhone as rude and disrespectful and that he did not want her on his team.


**5. 12/10/14 - Subject "Gift for you."**

Plaintiff - Brought two miniature bananas for you.

Gill - I rather not have banana today.  I had enough last night.  smile

Plaintiff - I know you did.

Gill - Will if you say so . . . so u enjoy the little bananas. .
Plaintiff - You wish!!!!
Gill - Ha ha . . it's okay your secret is safe with me. .
Plaintiff - I will hold my comments . . . know the medium I am using.
Gill - Well.  Enjoy your afternoon.

(ECF No. 56-2, Ex. 10).

Plaintiff testified that he was joking about going on a cruise with Ms. Wallace and that the conversation with Ms. Gill regarding "little bananas" was not sexual on his part, and he doubted it was sexual on her part.  (ECF No. 56-2 at 131-33, 155-58.)

Ms. Ponder provided a copy of these emails to Ms. Forino.  (ECF No. 56-9 ¶ 7; ECF No. 56-4 at 100-01.).  Ms. Forino reviewed the emails and determined that Plaintiff had improper communications with his subordinates.  (ECF No. 56-9 ¶ 7.)  Ms. Forino recommended terminating Plaintiff's employment that day.

In an email to Ms. Ponder and Mr. Trawick, Ms. Forino stated that she did not believe it was necessary to interview the subordinate female associates with whom Plaintiff had emailed because she thought the emails were sufficient objective evidence to show that Plaintiff had engaged in conduct unbecoming a manager.  (*Id.*; ECF No. 56-2, Ex. 11.) Ms. Forino requested and received approval from Mr. Trawick to proceed with termination that day.  According to Mr. Trawick, he considered the emails "to constitute serious misconduct."  (ECF No. 56-7 ¶ 4.)

Ms. Forino testified that, at the time of Plaintiff's termination, she was not aware of any complaints by Plaintiff regarding Mr. Shelley, and Mr. Shelley was not involved in the decision to terminate Plaintiff's employment.  (ECF No. 56-9 ¶ 8.) Ms. Forino, Mr. Trawick, Ms. Ponder, and Mr. Shelley all testified that Mr. Shelley was not in any way involved in the decision to terminate Plaintiff.  (*Id.*; ECF No. 56-4 at 104; ECF No. 56-3 at 93; ECF No.

16

56-7 ¶ 6.)  Mr. Shelley was not informed of the matter until the day of Plaintiff's termination when he was told about the emails and was told to terminate Plaintiff for conduct unbecoming a manager.  (ECF No. 56-3 at 93; ECF No. 63-3 at 96; ECF No. 56-7 ¶ 6.) Plaintiff was told he was being terminated for engaging in conduct unbecoming a manager. (ECF No. 56-2 at 163.)

In paragraph seven of his objections, Plaintiff asserts that the Magistrate Judge misconstrued the evidence regarding Ms. Massaquoi and that the Magistrate Judge "did not provide any context reflecting the absurdity of taking adverse employment action against Plaintiff based on Ms. Massaquoi's complaints."  (ECF No. 70 at 3.)  Plaintiff asserts that the Magistrate Judge failed to include a description of Ms. Massaquoi's "tirade in which she accused Greg Evans, a white supervisor, of "treating [her] like a slave."  (*Id.*) Plaintiff contends that neither Mr. Evans nor Ms. Preuter was investigated based on Ms. Massaquoi's allegations of racism and that he was the only one investigated.

Next, in paragraphs eight and nine of this objections, Plaintiff contends that the Magistrate Judge's discussion of his emails was "unfairly slanted negatively towards Plaintiff" and that the emails themselves are not objectively inappropriate.  (*Id.*)  Plaintiff contends that the Magistrate Judge's analysis failed to provide context for Plaintiff's gregarious personality, and that the Magistrate Judge's recitation of the facts leaves out "anything potentially favorable to Plaintiff."

After review, the Court finds Plaintiff's objections in paragraphs seven, eight, and nine without merit.  The Court finds no error in the Magistrate Judge's explanation of the incident involving Ms. Massaquoi.  The Magistrate Judge explained Ms. Massaquoi's specific complaints regarding Plaintiff, and  contrary to Plaintiff's assertion, the Magistrate

Judge did include the fact that Ms. Massaquoi called Ms. Preuter was a racist. It does not appear that the Magistrate Judge drew negative inferences against Plaintiff in outlining these facts; rather, a review of the Magistrate Judge's report indicates that he simply outlined the sequence of events as indicated by the testimony. The evidence indicates that Ms. Massaquoi raised specific issues about Plaintiff and others, and Defendant ultimately investigated whether Plaintiff was having any inappropriate relationships with his subordinates and discovered what Defendant considered to be inappropriate emails. Although Plaintiff asserts that "the portrayal of the disciplinary incidents leading to Plaintiff's termination, in particular, gives no frame of reference for reality," nowhere does Plaintiff cite to any specific evidence that portrays another reality. (ECF No. 70 at 4.) Overall, the Court finds Plaintiff's factual objections without merit.

## II.     Plaintiff's Legal Objections

As the Magistrate Judge noted, in his complaint Plaintiff alleges race-based discrimination in violation of 42 U.S.C. § 1981 based on the theories of disparate treatment and hostile work environment. In his Report, the Magistrate Judge evaluated Plaintiff's claims and determined, with respect to Plaintiff's disparate treatment claim, that Plaintiff failed to establish a prima facie case because he failed to show that he was treated differently than other similarly situated employees outside the protected class. (ECF No. 66 at 17.) In addition, the Magistrate Judge determined that even if Plaintiff could establish a prima facie case of disparate treatment, his claim still failed because Plaintiff could not show that Defendant's stated reason for terminating his employment was pretext for racial discrimination. With respect to Plaintiff's hostile work environment claim, the Magistrate Judge determined that Plaintiff failed to show that Mr. Shelley's comments were sufficiently

18

severe or pervasive to alter his conditions of employment. Lastly, with respect to Plaintiff's claim for libel or slander, the Magistrate Judge noted that Plaintiff conceded that discovery did not yield sufficient evidence to support the claim. Thus, the Magistrate Judge recommended that the Court grant summary judgment on all of Plaintiff's claims.

### A.     Plaintiff's Disparate Treatment Claim

To establish a prima facie claim for disparate treatment, a plaintiff must show that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment or evidence exists giving rise to an inference of unlawful discrimination. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). If Plaintiff can establish a prima facie case, then the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for its actions against Plaintiff. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981). If Defendant meets this burden, then Plaintiff must show by a preponderance of the evidence that the proffered reason was pretext for discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

As previously mentioned, the Magistrate Judge determined that Plaintiff failed to establish a prima facie claim for disparate treatment because he failed to show that he was treated differently than other similarly situated employees outside his protected class. (ECF No. 66 at 17.) In addition, the Magistrate Judge determined that even if Plaintiff could establish a prima facie case of disparate treatment, his claim still failed because Plaintiff could not show that Defendant's stated reason for terminating his employment was pretext for racial discrimination.

19

In paragraphs ten through fifteen of his objections, Plaintiff complains about the Magistrate Judge's analysis of his disparate treatment claim and asserts that the Magistrate Judge took an "overly rigid approach to the white comparators identified by Plaintiff." (ECF No. 70 at 4.) Plaintiff again complains that Mr. Evans was not investigated based on Ms. Massaquoi's complaints while he was, and with respect to Ms. Preuter, Plaintiff contends that the Magistrate Judge improperly concluded that Ms. Scott's allegations against her were less specific and less severe than Ms. Scott's allegations against Plaintiff. (*Id.* at 5.) In addition, Plaintiff complains that no one else's email was searched, and he argues that the Magistrate Judge disregarded evidence that Mr. Shelley's obvious animus towards Plaintiff colored the entire human resources process, although he does not cite to specific evidence in this regard. (*Id.* at 6.)

With respect to Mr. Evans, the Magistrate Judge noted that he was a team leader under Plaintiff's supervision and that a female employee told a co-worker that Mr. Evans was pursuing her and reported the matter to Defendant. A Human Resources representative conducted a review and told Plaintiff to meet with Mr. Evans because Plaintiff was his supervisor. Plaintiff told Mr. Evans that the employee felt uncomfortable and that Mr. Evans needed to be conscious of his interactions with her. Ultimately, the Magistrate Judge determined that Mr. Evans was not similarly situated to Plaintiff because the female employee who complained of Mr. Evans' behavior was not subordinate to Mr. Evans and did not work in the same department as Mr. Evans, whereas the individuals with whom Plaintiff communicated in the emails that were found to be inappropriate were Plaintiff's subordinates. In addition, the Magistrate Judge noted that Plaintiff's position was a higher management position.

The Magistrate Judge also found that Ms. Preuter was not similarly situated to Plaintiff because Plaintiff was in a higher level management position and because Plaintiff was on a final warning whereas there was no evidence that Ms. Preuter was on a final warning. Moreover, the Magistrate Judge determined that Ms. Scott's complaints against Plaintiff were more specific than her complaints against Ms. Preuter.

Ultimately, the Court finds no error in the Magistrate Judge's analysis. Despite Plaintiff's contention that Mr. Evans and Ms. Preuter were in the same basic managerial chain and responded to the same human resources department and senior managers, the evidence indicates that Plaintiff was higher up in the organizational chain and subject to different standards, and that the general nature of the claims against Plaintiff differed from that of the claims against Mr. Evans and Ms. Preuter. *See Haywood v. Locke*, 387 F. App'x 355, 358 (4th Cir. 2010) (noting that for a plaintiff to show that he is similar in all relevant aspects to a comparator "would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it'") (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Importantly, however, even if the Magistrate Judge did err in finding that Mr. Evans and Ms. Preuter were not similarly situated to Plaintiff, the Court nevertheless agrees with the Magistrate Judge that Plaintiff still cannot show that Defendant's stated reason for terminating him was pretext for racial discrimination. In the Report, the Magistrate Judge considered Plaintiff's arguments regarding pretext, and the Magistrate Judge considered the fact that Plaintiff and the individuals with whom Plaintiff communicated all denied

engaging in inappropriate relationships. However, as the Magistrate Judge noted, the fact that Ms. Wallace, Ms. Gill, and Ms. Harris testified at the employment hearing that they did not consider Plaintiff's behavior to be inappropriate is insignificant as "[i]t is the perception of the decisionmaker that is relevant," not the opinions of Plaintiff's co-workers. *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980); *see also Evans v. Technologies Apps. & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (rejecting the plaintiff's unsubstantiated allegations and personal opinions concerning her qualifications and noting that the relevant perception is that of the decision maker). Here, Ms. Ponder testified that Plaintiff was not terminated from employment because of a confirmed affair but that he was terminated for engaging in conduct that Defendant deemed unbecoming of a manager based on what Defendant considered to be inappropriate emails. Plaintiff contends that his emails alone do not present a legitimate, nondiscriminatory reason for termination, and he argues that the Magistrate Judge completely disregarded evidence that Mr. Shelley's obvious animus against Plaintiff infected the entire human resources process. However, after review of the record, the Court finds these unsupported allegations without merit. The Magistrate Judge clearly considered Mr. Shelley's feelings about Plaintiff, and, as the Magistrate Judge noted, even if Plaintiff could demonstrate racial animus on the part of Mr. Shelley, the record contains no evidence to show that Mr. Shelley had any involvement in Plaintiff's termination, or that Mr. Shelley's feelings in any way "infected" the human resources process. In other words, despite Plaintiff's bald assertions, the uncontradicted testimony from Mr. Shelley, Ms. Forino, and Mr. Traywick indicates that Mr. Shelley was not involved in the investigation into Plaintiff's emails or the ultimate decision to terminate Plaintiff. (ECF No. 66 at 21-22.) The Court agrees with the Magistrate Judge that Plaintiff has not shown

22

that Defendant has offered shifting or changing reasons for his termination, and that Plaintiff has not shown by a preponderance of the evidence that Defendant's stated reason for terminating him was pretext for unlawful discrimination.

### B. Plaintiff's Hostile Work Environment Claim

To avoid summary judgment on his hostile work environment claim, Plaintiff must point to evidence that would allow a reasonable jury to conclude that:(1) he was harassed based on his race; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis exists for imputing liability to the employer. *Equal Emp't Opportunity Comm'n v. Central Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009).

Here, the Magistrate Judge determined that Plaintiff failed to show that the harassment was sufficiently severe or pervasive to alter Plaintiff's conditions of employment. In so finding, the Magistrate Judge considered the Fourth Circuit's decision in *Boyer-Liberto v. Fontaineblue Corp.*, 786 F.3d 264 (4th Cir. 2015) (en banc), where the court found that even though "hostile work environment claims often involve repeated conduct," an "isolated incident of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (internal quotations omitted).[1]  Specifically, with regard to *Boyer-Liberto*, the Magistrate

---

[1]  In *Faragher*, the Supreme Court stated that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'").  524 U.S. at 788; *see also Jordan v. Alternative Resources Corp.*, 458 F.3d 332 (4th Cir. 2006) ("Courts determine 'whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening

Judge stated:

> In *Boyer-Liberto*, a managerial employee berated the plaintiff in a physically threatening manner, told the plaintiff she was going to make her sorry, and called her either a "damn porch monkey" or a "dang porch monkey." 786 F.3d at 270. The incident continued into the following day when the manager again called the plaintiff a "porch monkey." *Id.* In holding that the incident could alter the conditions of employment and create a hostile work environment, the Fourth Circuit recognized that "no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet . . . by a supervisor in the presence of his subordinates." *Id.* at 280.
>
> Here, the only comment directed to the plaintiff personally was the comment about his accent. The comment was made with no one else present, the comment did not involve the use of an unambiguously racial epithet in the presence of co-workers, no threat or profanity was used, and the plaintiff does not allege that Mr. Shelley was berating him, angry, or physically threatening when he made the comment. *See Irani v. Palmetto Health*, C.A. No. 3:14-CV-3577-CMC, 2016 WL 3079466, at *26-27 (D.S.C. June 1, 2016) (distinguishing *Boyer-Liberto*). While Mr. Shelley's comment that he did not think he could survive in Barbados "around those coons" was certainly offensive, there is no evidence the comment was directed at the plaintiff personally, that it was made with anyone else present, or that it was made with threats, profanity, or while Mr. Shelley was berating or angry with the plaintiff. Further, there is no evidence that the comments regarding the employee's tattoo or the applicant's albinism were in any way related to the plaintiff's race. With regard to Mr. Shelley asking the plaintiff why he was hiring so many black people to fill openings in his department, the plaintiff testified that a majority of the employees in the department were African-American (doc. 63-1, pl. dep. 63). Mr. Shelley had ultimate hiring authority, and the plaintiff could not recall one African-American employee who was qualified for the position whom Mr. Shelley did not hire because of their race (*id.*).

(ECF No. 66 at 24-25.)

---

or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'") (citation omitted).

In the last section of his objections, Plaintiff asserts that the Magistrate Judge misapplied *Boyer-Liberto* and unfairly minimized the severity and hostility of the slurs in this case. (ECF No. 70 at 7.) Plaintiff contends that Mr. Shelley's slurs were made in a context at least as threatening as that in *Boyer-Liberto* because Mr. Shelley was Plaintiff's supervisor and had previously tried to have him fired.

As an initial matter, Plaintiff is correct that it is important to note that Mr. Shelley was Plaintiff's supervisor, as the Fourth Circuit in *Boyer-Liberto* clearly stated: "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor–e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.'" *Id.* at 278 (quoting *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)). Nevertheless, the Court agrees with the Magistrate Judge that this case is still distinguishable from *Boyer-Liberto*. As the Magistrate Judge noted, although the use of the term "coon" was certainly offensive, it was not directed at Plaintiff or made in front of Plaintiff's co-workers, and there is no allegation that Mr. Shelley was using the term to "cap explicit, angry threats that [he] was on the verge of utilizing [his] supervisory powers to terminate" Plaintiff's employment. *Id.* at 280. Thus, the Court agrees with the Magistrate Judge that although the comment was rude and inappropriate, it was not on par with the circumstances presented in *Boyer-Liberto*. Moreover, with respect to the other alleged comments made by Mr. Shelley, considering the totality of the circumstances, including the frequency of the comments, their severity, and whether the comments were made in a threatening or humiliating manner or were merely offensive utterances, the Court finds that Plaintiff's evidence falls short of that needed to overcome summary judgment.

Finally, the Court also notes that Plaintiff has not objected to the Report's analysis of the subjective component of the severe or pervasive element. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.")  As the Magistrate Judge noted, there is no evidence that Plaintiff perceived his work environment as hostile or abusive.  Plaintiff testified that he did not "rely" on the comments, and he "let it roll of [his] back." (ECF No. 63-1 at 61-62.)  Plaintiff also testified that he did not have a lot of interaction with Mr. Shelley, and Plaintiff never reported this behavior to anyone in a management position higher than Mr. Shelley.

Based on the foregoing, the Court agrees with the Magistrate Judge that Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

### III.    Plaintiff's Libel/Slander Claim

In response to Defendant's motion for summary judgment, Plaintiff conceded that discovery did not yield sufficient evidence to support his libel or slander claim, and Plaintiff does not object to the Magistrate Judge's recommendation that the Court grant summary judgment on this claim.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court hereby ADOPTS the Magistrate Judge's Report

(ECF No. 66); the Court overrules Plaintiff's objections to the Report (ECF No. 70); and the

Court grants Defendant's motion for summary judgment (ECF No. 56).

**IT IS SO ORDERED.**

s/Bruce H. Hendricks
The Honorable Bruce Howe Hendricks
United States District Judge

September 25, 2017
Greenville, South Carolina